LOCKE LORD BISSELL & LIDDELL LLP
Thomas J. Cunningham (SBN: 263729)
tcunningham@lockelord.com
Daniel A. Solitro (SBN: 243908)
dsolitro@lockelord.com
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone:    (213) 485-1500
Facsimile:    (213) 485-1200

Attorneys for Defendant
WELLS FARGO BANK, N.A.



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY YELLIN and ELLEN YELLIN, on their own behalf and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A. and DOES 1 through 10, inclusive,<br><br>　　　　　Defendants. | CASE NO. **CV 10 2665**<br><br>**DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF REMOVAL**<br><br>**[28 U.S.C. §§ 1332, 1441 and 1446]**<br><br>[Superior Court of California, San Francisco County, Case No. CGC 10-500019]<br><br>Complaint Filed: May 20, 2010 |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant Wells Fargo Bank, N.A. ("Wells Fargo") hereby removes to this Court the state court action described below.

### THE STATE COURT ACTION

1.     On May 20, 2010 an action was commenced in the Superior Court of California, San Francisco County, entitled *Jeffrey Yellin, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. CGC 10-500019 (the "State Court Action"). A true and accurate copy of the complaint in the State Court Action (the "Complaint") is attached hereto as *Exhibit A*.

2.     The Complaint purports to assert five causes of action, identified and/or generally alleged as follows: (1)"Breach of Contract," (2)"Bad Faith Breach of Contract," (3)"Breach of Implied Covenant," (4)"Unjust Enrichment," and (5)"Violation of UCL."

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

**GROUNDS FOR JURISDICTION**

3.    This Notice of Removal is filed within 30 days of the filing of the Complaint and, thus, within 30 days of the date any defendant could have become aware of the State Court Action. Removal is therefore timely in accordance with 28 U.S.C. § 1446(b).

4.    This is an action over which this Court would have original jurisdiction pursuant to 28 U.S.C. § 1332(a), and which may be removed to this Court pursuant to 28 U.S.C. § 1441(b), because there is complete diversity of citizenship between Plaintiffs and the only named Defendant, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

5.    The Complaint alleges that Plaintiffs reside in Oak Park, California. (Compl. ¶ 11). Thus Plaintiffs are citizens of California.

6.    Wells Fargo is not a citizen of California. Specifically, Wells Fargo is a national banking association organized pursuant to the laws of the United States with its main office, as specified in its Articles of Association, located in Sioux Falls, South Dakota. (*See* FDIC Institution Directory listing for Wells Fargo Bank, N.A., attached hereto as *Exhibit B*). Thus, for purposes of diversity jurisdiction, Wells Fargo is a citizen of North Dakota only. *Wachovia Bank, N.A.* v. *Schmidt,* 546 U.S. 303 (2006) (a national bank is "located" for diversity jurisdiction purposes, only in the state of its "main office" as designated in its articles of association); *see, e.g., Peralta v. Countrywide Home Loans, Inc.*, No. 09-3288, 2009 WL 3837235, *4-5 (N.D. Cal. Nov. 16, 2009).

7.    Furthermore, it is "more likely than not" that the amount in controversy exceeds $75,000. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (stating that it only need be "more likely than not" that the amount in controversy exceeds $75,000); *Mendoza v. OM Financial Life Ins. Co.*, No. 09-01211 JW, 2009 WL 1813964, *3 (N.D. Cal. June 25, 2009) ("[W]here a ... complaint does not specify a particular amount of damages, the removing defendant bears the burden of establishing, by a preponderance of the evidence ... that it is 'more likely than not' that the amount in controversy exceeds [$75,000].") (citing *Sanchez*, 102 F.3d at 404).

8.    While the Complaint does not request a specific amount of damages, it states that Plaintiffs' home equity line of credit ("HELOC") was reduced from $200,000 to $111,448, a decrease of just under $89,000. (Compl. ¶ 11). Plaintiffs seek reinstatement of their HELOC at its

1    full original limit of $200,000. (*Id.* ¶¶ 43, 62, 82). Plaintiffs also seek punitive damages. (*Id.* ¶ 50).

2    Thus it is far "more likely than not" that the amount in controversy exceeds $75,000. *See Duran v.*

3    *Aurora Loan Services*, No. 09-0138, 2009 WL 1110645, *3 (E.D. Cal. Apr. 24, 2009) (noting that a

4    party could have "establish[ed] that the amount in controversy exceed[ed] the jurisdictional amount

5    of $75,000" by "referenc[ing] a note secured by the property in the amount of $135,000").

6    　　9.　　In conjunction or in the alternative, this is an action of which this Court would have

7    original jurisdiction pursuant to 28 U.S.C. § 1332(d). *See* 28 U.S.C. § 1332(d) (vesting district

8    courts with original jurisdiction of any civil action in which the amount of controversy exceeds

9    $5,000,000, the number of proposed plaintiffs is 100 or greater, and any member of the plaintiff

10   class is a citizen of a state different from any defendant). The Complaint alleges a California

11   statewide class of a "substantial percentage" of "thousands of borrowers." (Compl. ¶ 29). It also

12   alleges that Wells Fargo engaged in a "scheme to ... reduce credit limits on hundreds of millions of

13   dollars worth of [HELOCs] across the State of California." (*Id.* ¶ 1). Based on these assertions,

14   there is the requisite diversity of citizenship, the required numerosity, and it is "more likely than not"

15   that the amount in controversy exceeds $5,000,000. *See Peralta*, 2009 WL 3837235 at *3-4.

16   **REMOVAL REQUIREMENTS**

17   　　10.　　Upon information and belief, no other defendants have been named, let alone served

18   with the Complaint in this matter, and therefore additional consent to this removal is not required.

19   *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1 (9th Cir. 1988) (requirement for consent

20   applies "only to defendants properly joined and served in the action").

21   　　11.　　Removal is proper to this Court pursuant to 28 U.S.C. § 1441(a), because the

22   Northern District of California is the federal judicial district embracing the Superior Court of

23   California for the San Francisco County, where the State Court Action was originally filed.

24   　　12.　　On the date of this Notice of Removal, a copy of this Notice is being served on

25   Plaintiffs' attorneys of record. Further, a copy of this Notice will be filed in the State Court Action

26   with the Clerk of the Superior Court of California, San Francisco County.

27

28

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1

## CONCLUSION

2      By this Notice of Removal and the associated attachments, Wells Fargo does not waive any

3  objections it may have as to service, jurisdiction or venue, or any other defenses or objections it may

4  have to this action. Wells Fargo intends no admission of fact, law or liability by this Notice, and

5  expressly reserves all defenses, motions and/or pleas.

6      **WHEREFORE**, Wells Fargo prays that the State Court Action be removed to this Court,

7  that all further proceedings in the State Court Action be stayed, and that Wells Fargo receive all

8  additional relief to which it is entitled.

9

10  Dated: June 18, 2010                    LOCKE LORD BISSELL & LIDDELL LLP

11                                          By: _____
                                                Thomas J. Cunningham
12                                              Daniel A. Solitro

13
                                            Attorneys for Defendant
14                                          WELLS FARGO BANK, N.A.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

4

# EXHIBIT A

05/20/2010    First Legal

4156261331
SUMMONS ISSUED
F I L E D
San Francisco County Superior Court

MAY 2 0 2010

CLERK OF THE COURT
BY: _____ Deputy Clerk
P. NATT

CASE MANAGEMENT CONFERENCE SET

OCT 2 2 2010   9:00 AM

DEPARTMENT 212

ORIGINAL

1   Sean Reis (SBN 184044)
    Edelson McGuire LLP
2   30021 Tomas Street, Suite 300
    Rancho Santa Margarita, CA 92688
3   T: (949) 459-2124
    F: (949) 459-2123
4   sreis@edelson.com

5   *Counsel for Plaintiff*
    [additional counsel appear on signature page]
6

7

8         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**   MAY 2 0 2010

9                       **SAN FRANCISCO COUNTY**

| | |
|---|---|
| JEFFREY YELLIN and ELLEN YELLIN, Individuals, on their own behalf and on behalf of all others similarly situated, | CGC · 1 0 . 5 0 0 0 1 9 <br> Case No: |
|      Plaintiffs, | **CLASS ACTION COMPLAINT FOR:** |
| v. | |
| WELLS FARGO BANK, N.A. and DOES 1 through 10, inclusive, | 1.   Breach of Contract; <br> 2.   Bad Faith Breach of Contract; <br> 3.   Breach of Implied Covenants; |
|      Defendants. | 4.   Unjust Enrichment; and <br> 5.   Violation of UCL. |
| | **AND DEMAND FOR JURY TRIAL** |

Jeffrey Yellin and Ellen Yellin (collectively "Plaintiffs"), for their Complaint, allege as

follows upon information and belief, based upon, *inter alia*, investigation conducted by their

attorneys, except as to those allegations pertaining to Plaintiffs and their counsel personally, which

are alleged upon personal knowledge:

                          **Introduction**

     1.      This case is about Defendant Wells Fargo Bank N.A.'s ("Wells Fargo") unlawful,

unfair and fraudulent scheme to suspend accounts and reduce credit limits on hundreds of millions

of dollars worth of home equity lines of credit ("HELOCs") across the State of California. Wells

Fargo has systematically violated state law, breached its contracts with its consumers, and been

unjustly enriched with respect to its HELOC account suspensions and credit limit reductions.

     2.      Plaintiffs, along with each member of the putative class, had a HELOC originated

FAXED

1  or serviced by Wells Fargo for which Wells Fargo reduced or froze the available credit in breach

2  of Wells Fargo's own contract, and in a manner that was both illegal and grossly unfair.

3  Specifically, Wells Fargo breached its contracts and the implied covenants contained therein and

4  engaged in unfair and fraudulent conduct in violation of California's Unfair Competition Law

5  ("UCL"), (Cal Bus. & Prof. Code 17200 et. seq.) by (1) reducing credit limits or freezing HELOC

6  accounts without first reasonably assessing the value of each affected property or otherwise having

7  a sound factual basis for determining its borrowers' home values had significantly declined, (2)

8  suspending or reducing HELOC credit lines in the absence of significant declines in property

9  values that would warrant such actions, (3) failing to provide adequate notice of such actions to its

10  customers, and (4) employing an unreasonable, oppressive and illusory process for customers to

11  challenge their reductions or suspensions. As a result, Wells Fargo has collectively denied its

12  California customers access to hundreds of millions of dollars worth of bargained-for credit at a

13  critical economic time.

14      3.      To obtain redress for Wells Fargo's wrongful actions, Plaintiffs bring this class

15  action on behalf of themselves and the putative class for declaratory relief, damages for breach of

16  contract, tort damages for bad faith, restitution for unjust enrichment and equitable and injunctive

17  remedies under the UCL. Plaintiffs also assert an individual claim for negligence.

18                          **Nature of the Claims**

19      4.      As early as October 2008, Wells Fargo began sending form letters to hundreds, if

20  not thousands, of its California HELOC customers, summarily reducing or suspending their

21  HELOCs. Wells Fargo's letter to Plaintiffs specifically stated:

22      Wells Fargo has recently reviewed your Home Equity Account referenced above
        (your "Account"). According to your Home Equity Line of Credit Agreement, if
23      the value of the property securing the Account significantly declines, Wells Fargo
        may lower the credit limit on your Account.
24

25      Based on this review, we are lowering the credit limit of your Account to
        $111,448.08 *due to a substantial decline in the value of the property securing the*
26      *Account.*

27  *(See* October 29, 2008 "Notice of HELOC Reduction" letter, a true and accurate copy of which is

28

                                - 2 -

1  attached as Exhibit A.) Wells Fargo did not perform an accurate individualized assessment of its
2  customers' home values or other calculation to determine whether a significant decline in the
3  value of the property had in fact occurred. Rather, on information and belief, Wells Fargo
4  determined property values through dubious automated formulas, commonly known as Automated
5  Valuation Models ("AVMs"), with unreliable or inaccurate analyses designed to reach a
6  predetermined, unreasonably low result, and Wells Fargo lacked information about key variables
7  such as the original appraised value for the purposes of the HELOC account. In fact, Wells Fargo
8  sent its letter and reduced the credit limit or suspended the HELOCs of many homeowners,
9  including Plaintiffs, whose home values had not significantly declined.

10      5.      Wells Fargo's systematic mass reduction of HELOC limits violated California law
11  and constituted breaches of Wells Fargo's own HELOC contracts with its customers. While Wells
12  Fargo's contracts permit it to reduce a customer's credit limit if the individual property securing
13  the HELOC loses a significant amount of its value, the terms of the contract necessarily prohibit
14  Wells Fargo from unilaterally reducing the credit limit without the property having actually
15  significantly declined in value and without first assessing the value of the specific property relative
16  to its originally appraised value.

17      6.      The letters sent by Wells Fargo to Plaintiffs and the other proposed class members
18  indicated that the original credit limits could be reinstated if, in fact, the reason provided by Wells
19  Fargo for the credit reduction or suspension "no longer exists or is in error." However, the
20  suspension and reduction letters failed to provide HELOC customers with basic information,
21  including: (1) the purported value of their respective homes at the time the HELOCs were initially
22  entered into or at the time the credit limits were last increased, (2) the value of the homes at the
23  time Wells Fargo suspended the accounts or reduced the credit limits, (3) how Wells Fargo
24  determined those values, or (4) the property value that would be required to reinstate the full credit
25  limit. Thus, the notice of credit limit reduction provided by Wells Fargo failed to include
26  sufficient information for a customer to determine whether he or she should spend the time and
27  resources to challenge the reduction or suspension.

28

- 3 -

1      7.     In furtherance of its deceptive scheme, Wells Fargo's post-credit
2  reduction/suspension management and administration of customer complaints, inquiries and
3  attempted appeals and requests for reinstatement are likewise unfair, unreasonable and unlawful
4  under California law. When a customer attempts to participate in Wells Fargo's "appeals
5  process," Wells Fargo withholds necessary and material information including but not limited to
6  the present value of the property serving as collateral to the HELOC, the value of the property at
7  the time of the HELOC's origination or most recent credit limit increase (if any), the balance of
8  any primary mortgage at those times, and the value required for reinstatement of the credit line.
9  Wells Fargo also routinely conceals or falsely claims it is unable to disclose both the method
10  and/or the standards used to determine these values as well as the values themselves. This
11  information is material and needed by the customer in order to determine whether challenging
12  Wells Fargo's decision is appropriate or fiscally worthwhile.

13     8.     In addition to Wells Fargo's mass HELOC reductions being unfair and unlawful
14  under California law, they are patently unconscionable and in violation of public policy. Congress
15  passed the Emergency Economic Stabilization Act of 2008, Pub.L. No. 110-343, on October 3,
16  2008. As part of this law, Wells Fargo obtained, on information and belief, approximately $25
17  billion from an unprecedented $700 billion bailout funded by American taxpayers. The rationale
18  advanced for the bailout was that banks like Wells Fargo needed liquidity in the face of the
19  worsening subprime mortgage crisis and that such liquidity would be necessary to ensure the
20  continued flow of credit to consumers. Despite receiving the monies, Wells Fargo has instead
21  deprived its customers of crucial affordable consumer credit and has attempted to churn its
22  customers away from low interest HELOCs and toward higher-interest alternatives, such as credit
23  cards, even though its borrowers continue to meet their mortgage obligations in this faltering
24  economy.

25     9.     As a result, Wells Fargo was able to receive cash from taxpayers while
26  simultaneously implementing a scheme to avoid its existing contractual obligations to its
27  borrowers, including Plaintiffs, to continue to lend funds under the HELOCs on which the variable
28

- 4 -

1   rates had dropped to all-time low, thereby realizing a windfall at the expense of its borrowers and
2   taxpayers.

3          10.     In stark contrast to Well Fargo's scheme, its HELOC borrowers, such as Plaintiffs,
4   like most American consumers, are struggling in this difficult economy yet they continue to meet
5   their mortgage obligations. These customers have incurred appraisal fees, annual fees, an
6   increased price of credit, reduced credit scores, lost interest and other damages, including the
7   denial of access to their bargained-for credit lines.

8                                          **Parties**

9          11.     **Plaintiffs Jeffrey and Ellen Yellin:** Plaintiffs reside in Oak Park, California.
10   Starting in or about January 2007, Plaintiffs obtained a HELOC from Wells Fargo in the amount
11   of $200,000 secured by their personal residence in Oak Park, California (the "Subject Property").
12   They obtained the HELOC for personal, household, and family purposes, such as financing
13   substantial renovations of the Subject Property. In October 2008, Wells Fargo sent Plaintiffs a
14   letter indicating that Wells Fargo had reduced their HELOC credit limit to $111,448.08, which
15   was just above their outstanding balance at the time. (Ex. A.)

16          12.     **Defendant Wells Fargo:** Wells Fargo Bank, N.A. is a national banking
17   association, chartered in Sioux Falls, South Dakota, with its principle place of business located at
18   420 Montgomery St., San Francisco, CA 94163. Wells Fargo is considered a citizen of both South
19   Dakota and California.

20          13.     **Defendant Does 1 through 10, inclusive:** Plaintiffs are ignorant about the true
21   names of defendants sued as DOES 1 through 10, and their wrongful conduct, and therefore sue
22   these defendants by fictitious names. Plaintiffs will seek leave of Court leave to amend this
23   Complaint to allege their true names and capacities when ascertained. Additionally, Plaintiffs
24   allege on information and belief that at all relevant times, DOES 1-10, inclusive, were Wells
25   Fargo's agents, servants, employees, representatives, partners, and related or affiliated entities, and
26   in doing the things hereinafter mentioned, were acting in the course and scope of their agency,
27   employment, or retention with Wells Fargo's permission, consent, authority and ratification.

28

- 5 -

14. **Defendants' Aiding and Abetting or conspiring:** All Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs and the proposed class members, as alleged herein. In taking action, as described herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, Defendants, and their officers, directors, employees, and agents each acted with an awareness of the primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals and wrongdoing. Alternatively, Defendants had an agreement to unlawfully suspend and reduce Plaintiffs' and the putative class members' HELOCs and took steps in furtherance of that agreement by directing Wells Fargo's agents to use methods and calculations not allowed by applicable regulations to falsely justify its HELOC suspensions and reductions and its denial of requests for reinstatement.

15. Jurisdiction and venue are proper before this Court because Wells Fargo is located and does business in San Francisco County, California and because a substantial part of the events, circumstances, and/or omissions giving rise to these claims occurred in San Francisco County, California.

16. This Court has personal jurisdiction over Wells Fargo under Cal. Code Civ. Proc. § 410.10 because Wells Fargo is a citizen of California and because some of the acts alleged herein were committed in California, specifically in San Francisco County.

## Allegations as to Plaintiffs' Individual Claims

17. In or around January 2007, Wells Fargo and Plaintiffs entered into a HELOC agreement under the terms of which Wells Fargo provided Plaintiffs a $200,000 line of credit secured by a mortgage on the Subject Property. (*See* Home Equity Account Agreement and Disclosure Statement (the "Agreement" or "HELOC Agreement"), a true and accurate copy of which is attached as Exhibit B). On information and belief, Wells Fargo's valuation of the Subject Property at the time the HELOC was originated was $750,000.

- 6 -

1    18.    In October 2008, Defendant mailed Plaintiffs a letter indicating that the credit limit

2  of the account had been lowered to $111,448.08, an amount just over the then-current balance.

3  The letter stated that the reduction was "due to a substantial decline in the value of the property

4  securing the Account." (Ex. A.)

5    19.    Following the notice, Mr. Yellin promptly contacted Wells Fargo's customer

6  service in person and over the phone seeking a specific reason for the reduction.

7    20.    During Mr. Yellin's repeated calls to Wells Fargo customer service and visits to his

8  local Wells Fargo branch, various Wells Fargo customer service representatives informed Mr.

9  Yellin that:

10    a.    Wells Fargo was unable or unwilling to disclose the present value of the Subject

11    Property, as determined by Wells Fargo's AVM, until one of the customer service

12    representatives finally told Mr. Yellin that it was $582,000. The same representative

13    informed Mr. Yellin, however, that the only way to get the HELOC reinstated was to

14    submit Plaintiffs' financial information and re-qualify for a new HELOC.

15    b.    Wells Fargo was unable and unwilling to disclose the original value from which the

16    Subject Property had purportedly significantly declined, and that with respect to the

17    original value, Wells Fargo only keeps such information for 90 days and generally does not

18    keep such information in the customer's file.

19    c.    That Wells Fargo had actually made its decision to reduce credit limits or suspend

20    accounts due to new underwriting and loan-to-value ("LTV") ratio standards, and that

21    Plaintiffs' LTV was too high under the new LTV standard. However, another customer

22    service representative assured Mr. Yellin that the 80% LTV used at the HELOC

23    origination was still the benchmark LTV and the Subject Property has not fallen below this

24    benchmark LTV.

25    d.    The October 2008 Notice of HELOC Reduction letter was not triggered by an

26    appraisal of the Subject Property; rather, an evaluation of the "Oak Park area" where the

27    Subject Property is located had been performed by a "computer scoring system."

28

- 7 -

1    e.    Wells Fargo was willing and able to write a new HELOC with the original credit

2 limit of $200,000, using the Subject Property as security, if Plaintiffs would agree to pay a

3 higher interest rate than the rate under the present HELOC.

4    f.    The same AVM valuation of $582,000 that supposedly triggered the reduction of

5 Plaintiffs' HELOC would be sufficient to support a new HELOC in the amount of

6 $215,000, but only if Plaintiffs would submit new financial statements and re-qualify for a

7 new HELOC.

8    21.    In September 2009, Plaintiffs again contacted Wells Fargo in an attempt to reinstate

9 their HELOC. They were told that they would first need to submit personal financial statements

10 and, if their financial information was found to be satisfactory in Wells Fargo's discretion, they

11 would then need to order and pay for an appraisal of the Subject Property. Despite Wells Fargo's

12 prior inability to provide the value of the Subject Property at the time of the HELOC origination

13 and Wells Fargo's statement that Wells Fargo generally only keeps such information for 90 days,

14 in September 2009 a representative informed Plaintiffs their home was valued at $750,000 at the

15 time of origination.

16    22.    Wells Fargo took the above actions despite the fact Wells Fargo's HELOC

17 Agreement only permitted credit reductions and account suspensions when the value of the

18 property securing the HELOC has "significantly" declined. However, Plaintiffs' property did not

19 significantly decline in value. In fact, on information and belief, the fair market value of the

20 Subject Property at the time of the HELOC reduction was at least $610,000, based on the sales of

21 comparable properties in Oak Park, California, during the relevant period of time.

22    23.    On information and belief, in addition to using an unreasonably manipulated AVM

23 to undervalue Plaintiffs' home so as to justify their HELOC reduction, Wells Fargo further lacked

24 a sound factual basis to reduce the credit line because it did not consider the home's original value

25 or the balance remaining on Plaintiffs' first mortgage prior to making its decision to reduce

26 Plaintiffs' HELOC.

27

28

- 8 -

05/20/2010          First Legal          4156261331

1      24.    The initial unencumbered equity in Plaintiffs' home at the time of the HELOC
2  origination was \$336,000:

3          **\$750,000 (original appraised value) - \$214,000 (the first mortgage balance) –**
4                  **- \$200,000 (HELOC limit) = \$336,000 equity cushion.**

5      25.    At the time Wells Fargo reduced Plaintiffs' HELOC, their first mortgage had been
6  paid down to \$192,000. As Plaintiffs' first mortgage lender, Wells Fargo knew or should have
7  known of Plaintiffs' first mortgage balance at the time it reduced their HELOC. Thus, even under
8  Wells Fargo's own AVM-generated undervaluation of Plaintiffs' property at \$582,000, the
9  unencumbered equity was still \$190,000:

10         **\$582,000 (Wells Fargo's AVM valuation) - \$192,0000 (first mortgage balance) –**
11                 **- \$200,000 (HELOC limit) = \$190,000 equity cushion.**

12  This means that even under Wells Fargo's own, false, undervaluation, the unencumbered equity
13  had dropped by only 43.5 %. And given the actual value of Plaintiffs' property of at least
14  \$610,000, the actual unencumbered equity at the time of the HELOC reduction was \$218,000:

15             **\$610,000 (actual market value of the Subject Property) –**
16    **\$192,000 (the first mortgage balance) - \$200,000 (the HELOC limit) = \$218,000 equity**
17                                    **cushion.**

18  The decline in equity was thus only 35.2%. Hence, under either calculation, the drop in
19  unencumbered equity was not a "significant decline" within the meaning of the Agreement that
20  would trigger Wells Fargo's ability to reduce Plaintiffs' HELOC credit limit. At all times
21  relevant, Wells Fargo remained fully secured in the HELOC and Plaintiffs were never at risk of
22  default.

23     26.    Wells Fargo's reduction of the credit limit on Plaintiffs' HELOC denied Plaintiffs
24  access to credit and left them unable to finish their home remodeling. Wells Fargo's conduct
25  further dramatically increased the ratio of credit they used to the amount of credit Plaintiffs had
26  available to them. In turn, on information and belief, Wells Fargo's acts drove up Plaintiffs'
27  Credit Utilization Rate, a major component of their credit rating, thereby damaging Plaintiffs'
28

-9-

1   credit rating and increasing the cost of credit to them.

2                              **Class Certification Allegations**

3         27.     Plaintiffs seek certification of a class under California Rule of Court, Rule 3.764.

4         28.     **Definition of the Class:** Pursuant to Rule 3.764, Plaintiffs bring this Complaint

5   against Wells Fargo and Doe Defendants on behalf of a class (the "Class") of all persons in the

6   State of California:

7         (a)     who had a HELOC with Wells Fargo; and

8         (b)     whose HELOC was reduced or suspended by Wells Fargo; and

9         (c)     who received a letter from Wells Fargo which stated that the HELOC was reduced

10  or suspended "due to a substantial decline in the value of the property securing the account," or

11  words to that effect.

12        Excluded from the Class are 1) any Judge or Magistrate presiding over this action and

13  members of their families; 2) Wells Fargo, its subsidiaries, parent companies, successors,

14  predecessors, and any entity in which Wells Fargo or its affiliated entities have a controlling

15  interest and their current or former officers and directors; 3) persons who properly execute and file

16  a timely request for exclusion from the Class; and 4) the legal representatives, successors or

17  assigns of any such excluded persons.

18        Plaintiffs anticipate the potential need to amend the Class definition or to add subclass

19  definitions following discovery.

20        29.     **Numerosity:** The exact number of the members of the Class is unknown and not

21  available to Plaintiffs, but it is clear that individual joinder is impracticable. Wells Fargo sent its

22  generic credit line reduction letters to thousands of borrowers across the State of California, and a

23  substantial percentage of the recipients of these letters fall into the definition of the Class. Class

24  members can be easily identified through Wells Fargo's records.

25        30.     **Commonality:** Common questions of fact and law exist as to all members of the

26  Class and predominate over the questions affecting only individual members.

27  These common questions include:

28

                                    - 10 -

1       (a)   What were Wells Fargo's criteria for reducing the credit limits on its HELOCs;

2       (b)   Whether Wells Fargo had a sound factual basis for reducing HELOC limits based

3             on purported significant declines in home values;

4       (c)   What were Wells Fargo's methods for valuing the properties securing the

5             HELOCs;

6       (d)   Whether Wells Fargo was unjustly enriched at the expense of the Class members;

7       (e)   Whether Wells Fargo's reduction and suspension of the HELOCs breached the

8             terms of its HELOC Agreements with Class members;

9       (f)   Whether Wells Fargo's HELOC suspensions and reductions violated public policy;

10      (g)   Whether Wells Fargo's reduction and suspension of the HELOCs was unfair and/or

11            fraudulent;

12      (h)   Whether Wells Fargo violated the UCL when it required customers to first present

13            financial information in order to have the reduced or suspended HELOCs

14            reinstated; and

15      (i)   Whether Plaintiffs and the Class are entitled to relief and the nature of such relief.

16      31.   **Typicality:** Plaintiffs' claims are typical of the claims of other members of the

17   Class, as Plaintiffs and other Class members sustained damages arising out of the wrongful

18   conduct of Wells Fargo, based upon the same transactions which were made uniformly with

19   Plaintiffs and the Class members.

20      32.   **Adequate Representation:** Plaintiffs will fairly and adequately represent and

21   protect the interests of the members of the Class and have retained counsel competent and

22   experienced in complex class actions. Plaintiffs have no interests antagonistic to those of the

23   Class, and Wells Fargo has no defenses unique to Plaintiffs.

24      33.   **Predominance and Superiority:** This class action is appropriate for certification

25   because class proceedings are superior to all other available methods for the fair and efficient

26   adjudication of this controversy, since joinder of all members is impracticable. The damages

27   suffered by the individual members of the Class will likely be relatively small, especially given

28

- 11 -

1    the burden and expense of individual prosecution of the complex litigation necessitated by the

2    actions of Wells Fargo. It would be virtually impossible for the individual members of the Class

3    to obtain effective relief from the misconduct of Wells Fargo. Even if members of the Class

4    themselves could sustain such individual litigation, it would still not be preferable to a class

5    action, because individual litigation would increase the delay and expense to all parties due to the

6    complex legal and factual controversies presented in this Complaint. By contrast, a class action

7    presents far fewer management difficulties and provides the benefits of single adjudication,

8    economy of scale, and comprehensive supervision by a single Court. Economies of time, effort,

9    and expense will be fostered and uniformity of decisions will be ensured.

10       34.    **Policies Generally Applicable to the Class:** This class action is also appropriate

11   for certification because Wells Fargo has acted or refused to act on grounds generally applicable to

12   the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief

13   with respect to the Class as a whole. The policies of Wells Fargo challenged herein apply and

14   affect members of the Class, and Plaintiffs' challenge of these policies hinges on Wells Fargo's

15   conduct, not on facts or law applicable only to Plaintiffs.

16                  **FIRST CAUSE OF ACTION: BREACH OF CONTRACT**
                         **(on behalf of Plaintiffs and the Class)**
17
         35.    Plaintiffs incorporate the above Paragraphs as if fully set forth herein.
18
         36.    Plaintiffs and the other Class members obtained HELOCs from Wells Fargo. The
19
     terms of these HELOCs, which were drafted by Wells Fargo, constitute contracts between the
20
     Class members and Wells Fargo.
21
         37.    Section 18 of Wells Fargo's HELOC Agreements contains a term that purports to
22
     permit Wells Fargo to reduce the credit limit if "(c) the value of the [property securing the
23
     HELOC] declines significantly below [the property's] original appraised value." The credit limit
24
     and the conditions under which Wells Fargo could reduce the credit limit or suspend the accounts
25
     were material terms of Plaintiffs' and the Class members' HELOC Agreements.
26
         38.    Plaintiffs and the other Class members performed their obligations in full under
27
     their HELOC Agreements with Wells Fargo. They made the payments due to Wells Fargo and
28

- 12 -

05/20/2010          First Legal          4156261331

1  otherwise complied with all terms of the Agreements.

2  **A.     *Wells Fargo suspended HELOCs or reduced credit lines in the absence of a significant decline in the value of the properties securing the HELOCs.***

3          39.     Wells Fargo materially breached the HELOC Agreements by reducing the credit

4  limits or suspending the HELOCs of Plaintiffs and other Class members in the absence of a

5  significant decline in the value of the properties securing their respective HELOCs. On

6  information and belief, the fair market value of Plaintiffs' property at the time Wells Fargo

7  reduced their HELOC was at least $610,000, and because Plaintiffs had partially paid down their

8  primary mortgage balance, the decline in unencumbered equity in the Subject Property was just

9  35.2%, with a $218,000 "equity cushion" still remaining. Even considering Wells Fargo's own

10  flawed and incorrect AVM valuation, the Subject Property, and on information and belief those of

11  the Class members, did not significantly decline in value sufficient to justify suspension or credit

12  line reduction under the terms of the HELOC Agreements. In fact, one of Wells Fargo's

13  representatives admitted that the AVM valuation of $582,000 would be sufficient to support an

14  even higher, $215,000 HELOC if Plaintiffs were willing to re-qualify for a new HELOC bearing a

15  higher interest rate.

16  **B.     *Wells Fargo's reliance on its new LTV standards as a basis for reducing the Class members' credit lines was not permitted by the HELOC Agreements.***

17

18          40.     On information and belief, with respect to Plaintiffs and the other Class members,

19  Wells Fargo used a new, reduced LTV standard as the primary or contributing basis by which it

20  reduced or suspended the HELOCs. When Mr. Yellin contacted Wells Fargo's customer service

21  seeking a specific reason for the credit line reduction, a customer service representative stated that

22  Wells Fargo had made its decision to reduce credit limits or suspend HELOCs due to new

23  underwriting and LTV ratio standards and that Plaintiffs' LTV ratio was too high under the new

24  standard.

25          41.     The HELOC Agreements contain specific bases for which Wells Fargo can suspend

26  a HELOC or reduce credit limits. Specifically, Section 18 of the Agreement states in relevant part

27  as follows:

28          The Bank may suspend the use of my Account and temporarily prohibit future

- 13 -

05/20/2010          First Legal          4156261331

1    Advances during the Draw Period, or the Bank may reduce my credit limit, for
     any reason permitted by applicable law, including without limitation (a) if the
2    annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated
     herein, (b) there is any material change in my financial circumstances that the
3    Bank reasonably believes will make me unable to fulfill my repayment
     obligations under this Agreement, (c) the value of the Property declines
4    significantly below its original appraised value, as determined by the Bank, (d)
     my failure to comply with any material obligation under this Agreement or the
5    Security Instrument, (e) a regulatory authority has notified the Bank that
     continued Advances would constitute an unsafe and unsound business practice, (f)
6    I am in default under Section 17 above, or (g) government action prevents the
     Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this
7    Agreement or impairs the Bank's security interest in the Property, such that the
     value of the security interest is less than 120 percent of the credit limit.

8    (Ex. B, § 18.) The Agreement does not permit Wells Fargo to reduce the credit limit on an

9    existing HELOC in order to conform the HELOC to new LTV ratio terms that did not exist at the

10   time of the HELOC origination. Consequently, Wells Fargo's reduction of Plaintiffs' HELOC

11   limit, and those of the other Class members, in order to conform to its new LTV ratio policy

12   constitutes a breach of the Agreement.

13        42.    As an actual and proximate result of Wells Fargo's breaches of contract, Plaintiffs

14   and the other Class members suffered actual damages. These damages occurred in the form of

15   being denied the full bargained-for use of their credit lines, appraisal fees, annual fees, the

16   increased price of credit, adverse effect on their credit scores, loss of interest, and other damages.

17        43.    Plaintiffs, on their own behalf and behalf of the other Class members, seek actual

18   and compensatory damages for Wells Fargo's breach of contract, as well as reinstatement of the

19   wrongfully suspended or reduced HELOCS, plus interest, attorneys' fees, annual fees and costs in

20   an amount to be determined at trial.

21              SECOND CAUSE OF ACTION: BAD FAITH BREACH OF CONTRACT
                        IN VIOLATION OF PUBLIC POLICY
22                    (on behalf of Plaintiffs and the Class)

23        44.    Plaintiffs incorporate the above Paragraphs as if set forth fully herein.

24        45.    Wells Fargo acted with bad faith in violation of public policy with respect to the

25   breaches of its HELOC Agreements.

26        46.    In the process of reducing or suspending the Class members' HELOCs, Wells

27   Fargo has violated a social policy. Banks like Wells Fargo that received monies as part of the

28   taxpayer bailout and Trouble Asset Relief Program ("TARP") were provided those funds for the

                                        - 14 -

1  express purpose of making credit available to consumers. As then Secretary of Treasury Henry

2  Paulson explained when the banks received the bailout:

3       While many banks have suffered significant losses during this period of market
         turmoil, many others have plenty of capital to get through this period, but are not
4       positioned to lend as widely as is necessary to support our economy. This
         program is designed to attract broad participation by healthy institutions and to
5       do so in a way that attracts private capital to them as well. *Our purpose is to*
         *increase confidence in our banks and increase the confidence of our banks, so*
6       *that they will deploy, not hoard, their capital. And we expect them to do so, as*
         *increased confidence will lead to increased lending.* This increased lending will
7       benefit the U.S. economy and the American people.

8  "Statement by Secretary Henry M. Paulson, Jr. on Capital Purchase Program," *available at*

9  http://www.treasury.gov/press/releases/hp1223.htm (Oct. 20, 2008) (emphasis added). Hence,

10 there exists a strong social policy that banks receiving TARP funds use those monies to actually

11 make credit available to borrowers.

12       47.     Wells Fargo tacitly agreed to abide by this policy by accepting TARP funds –

13 approximately $25 billion – only to then hoard its capital by engaging in a systematic scheme to

14 reduce credit limits and suspend HELOC accounts irrespective of whether its Agreements

15 permitted such conduct. Wells Fargo further acted in bad faith by failing or refusing to consider

16 the primary mortgages of the Class members and, thus, not taking reasonable efforts to determine

17 the level of available equity in the properties – the primary consideration that Wells Fargo had or

18 should have had in deciding whether to suspend or reduce HELOCs.

19       48.     Wells Fargo's breach of the HELOC Agreements in violation of public policy

20 caused Plaintiffs and other Class members to incur damages in the form of appraisal fees, the

21 increased price of credit, lost interest, adverse effects on credit scores, denying them the benefits

22 of their HELOC Agreements, as well as emotional distress and other personal damages.

23       49.     Plaintiffs, on their own behalf and behalf of the other Class members, seek

24 reinstatement of HELOCs which were reduced or suspended, damages for Wells Fargo's bad faith

25 breach of contract, including tort damages of mental anguish, emotional distress and other

26 damages under the common law of breach of contract in violation of public policy, as well as

27 interest and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

28

- 15 -

1    50.    Further, in acting as alleged herein, Wells Fargo and Doe Defendants acted in a
2    manner that not only was contemplated to save Wells Fargo from having to perform under its
3    HELOC Agreements, but that would en masse enable Wells Fargo to use the money saved for its
4    own benefit and foreseeably cause severe economic and other consequential damages to Plaintiffs
5    and other members of the Class. Defendants' conduct amounts to a willful and malicious intent to
6    cause injury to Plaintiffs and the Class, while having made a commitment of continuing to lend the
7    funds as part of the TARP program. Wells Fargo and Doe Defendants therefore engaged in a
8    business design and scheme fraught with malice and bad faith to deprive large number of its
9    HELOC customers of small amounts of money, in conscious disregard of Wells Fargo's
10   contractual obligations and strong public policy, thereby warranting an assessment of punitive
11   damages in an amount appropriate to punish Wells Fargo and Doe Defendants and deter others
12   from engaging in similar misconduct.

13           **THIRD CAUSE OF ACTION: BREACH OF IMPLIED COVENANTS**
                   **(on behalf of Plaintiffs and the Class)**

14   51.    Plaintiffs incorporate the above Paragraphs as if fully set forth herein.

15   52.    Plaintiffs and the other Class members obtained HELOCs from Wells Fargo under
16   the terms of the HELOC Agreements. The terms of these HELOC Agreements constitute a valid
17   contract between the Class members and Chase.

18   53.    Implicit in the HELOC Agreements were contract provisions that prevented Wells
19   Fargo from engaging in conduct which frustrates the Class members' rights to the benefits of the
20   contract or which would impede the right of the Class members to enjoy the benefits of their
21   HELOCs.

22   54.    The credit limit was a material term of the Class members' HELOC Agreements.
23   Wells Fargo breached the implied covenant of good faith and fair dealing in the HELOC
24   Agreements by reducing the credit limit for Plaintiffs and other Class members' HELOCs without
25   first having a sound factual basis for claiming there was a decline in value, thereby preventing
26   Plaintiffs and the other Class members from receiving the benefits of their contracts.

27

28

- 16 -



**A.**    *Wells Fargo uses unreasonable and grossly inaccurate AVMs, insufficient to give Wells Fargo a sound factual basis for concluding the value of the property has significantly decreased.*

55.    Before reducing the limits of its customers' HELOCs, Wells Fargo had an obligation to have a sound factual basis for concluding that the value of the homes had actually declined significantly. Plaintiffs allege on information and belief that, instead, Wells Fargo knowingly and intentionally used a variety of dubious AVMs that relied upon unreasonably inaccurate formulas and unreliable data to reach a predetermined result and to manipulate and lower the values of Wells Fargo's HELOC customers' homes in order to justify the blanket reductions and suspensions of HELOCs. With respect to Plaintiffs, the AVM further did not take into account substantial home improvements Plaintiffs undertook immediately prior to their HELOC reduction. On information and belief, Wells Fargo's valuation methodology was further flawed in that Wells Fargo or its agents, acting under its direction and control, failed to, among other acts or omissions: (1) validate their AVMs on a periodic basis to mitigate the potential valuation uncertainty; (2) properly document the validation's analysis, assumptions, and conclusions; (3) appropriately back-test representative samples of the valuations against market data on actual sales; (4) account fairly for improvements, property type or geographic comparables; and/or (5) take other necessary steps to reasonably verify the accuracy of the valuations.

**B.**    *Wells Fargo lacks the original valuation of its borrowers' homes, and thus does not possess a sound factual basis for concluding the value of the property has significantly decreased.*

56.    On information and belief, prior to reducing or suspending the HELOCs, Wells Fargo did not take into account Plaintiffs' or the Class members' home values at the time of the HELOC origination, or at the time that the credit limits were last increased. In fact, Wells Fargo's customer service representatives expressly stated to Mr. Yellin that Wells Fargo only keeps such information for 90 days and that Wells Fargo generally does not keep such information in the customer's file. These values are necessary for determining whether the home values had actually decreased so as to have triggered Wells Fargo's rights to reduce or suspend the HELOCs. Accordingly, Wells Fargo lacked a sound factual basis for claiming Plaintiffs' and the Class

- 17 -

1 | members' homes had decreased in value since Wells Fargo had no initial value to which to

2 | compare any newly acquired value.

3 | **C.    Wells Fargo fails or refuses to consider the balance of a borrower's primary mortgage prior to reducing or suspending a HELOC.**

4 | 57.    Despite being Plaintiffs' primary (first) mortgage lender, Wells Fargo failed or

5 | refused to consider the balance of Plaintiffs' first mortgage before reducing their HELOC.

6 | Plaintiffs' partial paydown of their first mortgage meant that there was more equity in the Subject

7 | Property than that taken into account by Wells Fargo. By failing or refusing to even consider

8 | Plaintiffs' primary mortgage balance and, on information and belief those of the other Class

9 | members, Wells Fargo could not have had a sound factual basis for evaluating the available equity

10 | in the property and, thus, whether the Subject Property and the properties of the Class members

11 | had significantly declined in value. Hence, Wells Fargo did not have a sound factual basis for

12 | reducing the credit limits or suspending the accounts of the Class members.

13 | **D.    Wells Fargo requires the submission of financial documents as a prerequisite to challenging the account suspensions and reductions even though the suspensions and**
14 | **reductions were unrelated to the Class members' financial circumstances.**

15 | 58.    Section 18 of the HELOC Agreement states in relevant part that in order to

16 | reinstate a suspended HELOC or increase the credit limit, Plaintiffs must submit "satisfactory

17 | evidence to the Bank that the reason(s) for suspension or reduction of [the] Account no longer

18 | exist(s)."

19 | 59.    Wells Fargo breached the Agreements by requiring Plaintiffs and, on information

20 | and belief, the Class members to submit financial records as a prerequisite for challenging Wells

21 | Fargo's HELOC reductions and suspensions where the reason Wells Fargo gave for such action

22 | was purported "substantial decline in the value of the property securing the Account." Although

23 | financial records may be part of "satisfactory evidence" where Wells Fargo's stated reason for the

24 | account suspension or credit limit reduction was an adverse change in the borrower's financial

25 | circumstances, borrowers' financial documentation does not constitute evidence that could

26 | demonstrate that the Class members' property values had not significantly declined, which was

27 | Wells Fargo's stated reason in this case.

28 |

- 18 -

05/20/2010          First Legal          4156261331

**E.**     ***Wells Fargo takes steps to discourage borrowers from appealing the HELOC***
1          ***suspensions and reductions.***

2          60.     Wells Fargo further breached the implied covenant of good faith and fair dealing by
3     denying its customers information necessary to determine whether to appeal Wells Fargo's
4     account suspensions or reductions. As alleged, Wells Fargo's form letter, customer service
5     representations, and "appeals process" lack necessary details and information, shifting onto
6     borrowers the burden of appealing Wells Fargo's flawed decisions while depriving them of critical
7     information needed to determine whether to seek reinstatement in the first instance, including the
8     value of the property at the time of the HELOC origination, the actual present value of the
9     property as determined by Wells Fargo's AVM, how Wells Fargo calculated or determined the
10    "significance" of any decline in value, and what any subsequent appraisal would need to show in
11    order for the account to be reinstated. Wells Fargo also routinely conceals or falsely claims it is
12    unable to disclose both the method and/or the standards used to determine the relevant values, as
13    well as the values themselves. On information and belief, Wells Fargo intentionally withheld such
14    information in an effort to discourage borrowers from appealing its reductions and suspensions.

15         61.     As an actual and proximate result of Wells Fargo's breaches of the implied
16    covenant of good faith and fair dealing, Plaintiffs and the other Class members suffered actual
17    damages. These damages occurred in the form of being denied the full bargained-for use of their
18    credit lines, appraisal fees, annual fees, the increased price of credit, adverse effects on their credit
19    scores, loss of interest, and other damages.

20         62.     Plaintiffs, on their own behalf and behalf of the other Class members, seek actual
21    and compensatory damages for Wells Fargo's breach of the implied covenants, as well as
22    reinstatement of the wrongfully reduced or suspended HELOCs, plus interest, attorneys' fees, and
23    costs in an amount to be determined at trial.

24         **FOURTH CAUSE OF ACTION: RESTITUTION FOR UNJUST ENRICHMENT**
           **(on behalf of Plaintiffs and the Class, in the alternative to Counts I, II, and III)**
25
           63.     Plaintiffs incorporate Paragraphs 1 through 34 as if fully set forth herein.
26
           64.     In the alternative, and in the event this Court finds that no contract provision
27
      expressly governs the issues raised herein, Wells Fargo has knowingly received and retained
28

                                        - 19 -

05/20/2010          First Legal          4156261331

1  benefits from Plaintiffs and the Class members under circumstances that would render it unjust to
2  allow Wells Fargo to retain such benefits.

3      65.     By unlawfully freezing and reducing the HELOCs, due in significant part to the use
4  of inaccurate and unsubstantiated valuation models, Wells Fargo gained the time value of the
5  money it would otherwise be potentially liable for lending out to its HELOC customers.

6      66.     By suspending or reducing HELOCs, Wells Fargo further reduced its reserve ratio
7  and, hence, required less funds on hand to meet its reserve obligations. Moreover, Wells Fargo
8  was able to use funds it legally should have made available to the Class members to instead invest,
9  to provide loans to other individuals at higher interest rates, or generally to use at its discretion and
10  at the expense of the Class members.

11     67.     As an actual and proximate result of Wells Fargo's conduct, Plaintiffs and the Class
12  members have incurred damages in the form of the increased price of credit, adverse effects on
13  credit scores, appraisal fees, and other damages.

14     68.     Plaintiffs, on their own behalf and behalf of the other Class members, seek
15  restitution and disgorgement of all revenue and profits gained at the Class members' expense
16  through Wells Fargo's wrongful acts, as well as interest and attorneys' fees and costs pursuant to
17  Cal. Code Civ. Proc. § 1021.5.

18                **FIFTH CAUSE OF ACTION: VIOLATION OF CALIFORNIA'S UCL**
                       **(on behalf of Plaintiffs and the Class)**
19
       69.     Plaintiffs incorporate the above Paragraphs as if fully set forth herein.
20
       70.     Wells Fargo's reduction of the credit limit for Plaintiffs' and other Class members'
21
    HELOCs violated the California UCL because it constituted, and was premised on, unfair and
22
    fraudulent conduct by Wells Fargo. Wells Fargo's conduct was deceptive and untrue, as the
23
    AVMs used to determine the values of the properties securing such HELOCs were, on information
24
    and belief and as alleged above, without a sound factual basis and were designed to reach a
25
    predetermined inaccurate and unsubstantiated result so as to make their use unfair, deceptive and
26
    readily subject to manipulation. Furthermore, Wells Fargo unfairly reduced credit lines when
27
    significant declines in property value had not occurred and when Wells Fargo lacked a sound
28

- 20 -

1  factual basis to conclude otherwise. These deceptive, unfair, and fraudulent acts and practices
2  constitute unfair competition in violation of the UCL.

3  **A.     Wells Fargo's conduct violates the "Unfair" prong of the UCL.**

4        71.     Wells Fargo violated the "unfair" prong of the UCL in that Wells Fargo suspended
5  or reduced HELOCs despite the fact that there was no significant decline in the value of the
6  properties securing the HELOCs and despite the fact that Wells Fargo lacked any reasonable basis
7  for concluding otherwise. Wells Fargo uses AVMs that are inaccurate and unsubstantiated so as
8  to make their use, and the suspension/reduction decisions premised on their use, unfair. Wells
9  Fargo's actions are further unfair in that Wells Fargo reduced credit lines and suspended accounts
10  without taking into consideration the amount of available equity in the underlying property,
11  including the balance of any primary mortgage, despite the fact that the level of available equity is
12  or should be Wells Fargo's primary consideration in deciding whether to suspend or reduce a
13  HELOC account. Additionally, Wells Fargo unfairly makes determinations as to the "decline" in
14  a property's value without knowing and considering the valuation as of the time of the HELOC's
15  origination.

16        72.     Wells Fargo further violated the "unfair" prong of the UCL by claiming that it
17  based its HELOC reduction and suspension decisions on its new LTV ratio policy. A unilateral
18  change in the LTV ratios is not a legitimate grounds under the HELOC Agreements by which
19  Wells Fargo can reduce or suspend HELOCs. Thus, in addition to basing its decisions on a factor
20  that should not be considered for purposes of reducing or suspending a HELOC, Wells Fargo
21  unfairly used a new "policy" that was not in place at the time that the Agreements were executed.
22  This unfair practice demonstrates an unfair and unscrupulous pretext for its actions. Wells Fargo
23  further violated the "unfair" prong of the UCL by representing that the value of the Subject Matter
24  Property, as determined by Wells Fargo's AVM, was sufficient to support a new HELOC in the
25  amount of $215,000, but only if Plaintiffs submitted new financial statements and re-qualify for
26  the new HELOC. Such a representation further demonstrates the unfair and unscrupulous pretext
27  for its actions.

28

- 21 -

1      73.    Wells Fargo's conduct was further unfair because Wells Fargo denies its customers

2 information necessary to determine whether to appeal Wells Fargo's account suspensions or

3 reductions. As alleged, Wells Fargo's form letter, customer service representations, and "appeals

4 process" lack necessary details and information, shifting onto borrowers the burden of appealing

5 Wells Fargo's flawed decisions while depriving them of critical information needed to determine

6 whether to seek reinstatement in the first instance, including the value of the property at the time

7 of the HELOC origination, the actual present value of the property as determined by Wells Fargo's

8 AVM, how Wells Fargo calculated or determined the "significance" of any decline in value, and

9 what any subsequent appraisal would need to show in order for the account to be reinstated. Wells

10 Fargo also routinely conceals or falsely claims it is unable to disclose both the method and/or the

11 standards used to determine the relevant values, as well as the values themselves. On information

12 and belief, Wells Fargo intentionally withheld such information in an effort to discourage

13 borrowers from appealing its reductions and suspensions.

14      74.    Wells Fargo further violated the "unfair" and "fraudulent" prong of the UCL by

15 demanding the submission of financial information prior to allowing borrowers to challenge the

16 HELOC reductions and suspensions that were premised on supposed declines in property value.

17 Requiring that financial information be submitted despite the fact that the HELOC was reduced or

18 suspended on completely unrelated grounds is unfair and further demonstrates Wells Fargo's

19 unscrupulous pretext for its account suspensions and reductions.

20      75.    Wells Fargo's actions caused substantial injury to consumers, which is not

21 outweighed by any countervailing benefits to consumers or competition, and the injury is one that

22 consumers themselves could not reasonably have avoided.

23 **B.**    ***Wells Fargo's conduct violates the "Fraudulent" prong of the UCL.***

24      76.    Wells Fargo has violated the "fraudulent" prong of the UCL in that Wells Fargo's

25 statements regarding the availability of credit through the HELOCs were false and were likely to

26 deceive a reasonable consumer. Further, Wells Fargo's statements regarding any potential future

27 reduction of credit through the HELOCs would only occur through a substantial decline in value

were false and were likely to deceive a reasonable consumer.

28

- 22 -

77.     Specifically, Wells Fargo made a false statement of material fact in its letter of October 29, 2008 reducing Plaintiffs' HELOC. (Ex. A.) In that letter, Wells Fargo falsely represented that Plaintiffs' property that secured the HELOC had substantially declined in value. This representation was false as set forth in this Complaint, as Plaintiffs' property had, in fact, not significantly declined in value. Similar letters containing nearly identical – and false – representations were sent to the other Class members. Upon information and belief, Wells Fargo knew or should have known at the time of making this representation that such a representation was false, that Wells Fargo's AVMs were inaccurate, that Plaintiffs' and the Class members' properties had not declined in value significantly, and that Wells Fargo lacked a sound factual basis for concluding otherwise, particularly when it did not know or sufficiently consider the level of equity in the properties and/or the value of the properties at the time of the HELOC originations.

78.     Wells Fargo knew that it lacked a sound factual basis for reducing or suspending lines of credit because it knew that it did not evaluate the value of the properties as of the time of origination and that it was actually basing its reduction and suspension decisions on a new LTV ratio. If Wells Fargo was basing its HELOC reductions and suspensions on a new LTV ratio, then its statements to Class members that the HELOC reductions and suspensions were premised on a decrease in property value were fraudulent and intentionally misleading. If, however, the reductions and suspensions were not, in fact, based on a new LTV ratio, then Wells Fargo's representatives' statements to that effect were themselves fraudulent and intentionally misleading so as to decrease customer appeals and requests for account reinstatement.

79.     Nevertheless, on information and belief, Wells Fargo made the false representations in its suspension and reduction letters intentionally in an effort to falsely trigger its right to reduce or suspend Plaintiffs' and Class members' HELOCs. Wells Fargo knew and intended that its customers would rely on its misrepresentations, and such misrepresentations were likely to deceive reasonable HELOC borrowers into believing that their home values did in fact decline in value significantly and were further likely to prevent or limit appeals of Wells Fargo's account suspensions and reductions. Indeed, upon information and belief, in reliance on Wells Fargo's misrepresentation that their home value declined significantly, many Class members forewent appealing Wells Fargo's decision to reduce or suspend their HELOCs and thus incurred significant damages, including the lost use of the bargained-for credit line.

- 23 -

80.     Wells Fargo's violations of the UCL caused Plaintiffs and the other Class members to pay money to Wells Fargo in the form of fees, lost interest, lost of use of the bargained-for credit line, lost opportunity, adversely impacted credit and other damages.

81.     As a direct and proximate result of Wells Fargo's systematic unlawful credit reductions and account suspensions, Plaintiffs and the Class members have suffered adverse effects on their credit scores, as well as attorneys' fees and other damages.

82.     Plaintiffs, on their own behalf and behalf of the other Class members, seek an order preliminarily and permanently enjoining Wells Fargo's unfair competition alleged herein, requiring Wells Fargo to restore the Class members' suspended or reduced HELOC limits, and providing individual restitution of property gained by Wells Fargo's unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment and Orders in their favor and against Wells Fargo as follows:

(a)     Certifying the action as a class action and designating Plaintiffs and their counsel as representatives of the Class;

(b)     Awarding actual damages for the Class on the First, Second, and Third Causes of Action, including but not limited to monetary damages, reinstatement of HELOCs, appraisal fees, the increased price of credit, attorneys' fees, interest and other damages in an amount to be proved at trial;

(c)     Awarding tort damages and punitive damages for the Class for breach of contract in violation of public policy, and other common law damages on the Second and Third Causes of Action, including attorneys' fees and costs;

(d)     Granting preliminary and permanent equitable and injunctive relief for the Class, including enjoining Wells Fargo from further violations of the UCL and restoration of the Class members' HELOC limits, as well as restitution of property gained by the unfair competition alleged herein, and an order for accounting of such property;

- 24 -

05/20/2010          First Legal                    4156261331

1       (e)     Awarding pre- and post-judgment interest;

2       (f)     Attorneys' fees and costs on all Causes of Action allowable; and

3       (g)     Granting such other and further relief as the Court may deem just and proper.

4
                                    **JURY TRIAL DEMAND**
5
        The Plaintiffs hereby demand a trial by jury of all issues so triable.
6
        Dated: May 18, 2010
7                                                           JEFFREY and ELLEN YELLIN, on their
                                                            own behalf and on behalf of all others
8                                                           similarly situated,

9                                                           By:
                                                            Sean P. Reis (SBN 184044)
10                                                          Edelson McGuire, LLP
                                                            30021 Tomas Street, Suite 300
11                                                          Rancho Santa Margarita, CA 92688
                                                            (949) 459-2124 (phone)
12                                                          (949) 459-2123 (fax)
                                                            sreis@edelson.com
13
                                                            Steven Lezell (*pro hac vice* to be sought)
14                                                          Evan M. Meyers (*pro hac vice* to be sought)
                                                            Edelson McGuire, LLC
15                                                          350 N. LaSalle Street, Suite 1300
                                                            Chicago, IL 60654
16                                                          (312) 589-6370 (phone)
                                                            (312) 589-6378 (fax)
17                                                          slezell@edelson.com
                                                            emeyers@edelson.com
18

19

20

21

22

23

24

25

26

27

28

                                        - 25 -

# EXHIBIT B

6/18/2010                                                    FDIC: Bank Find

 **FDIC** FEDERAL DEPOSIT
INSURANCE CORPORATION                                        Advanced Search    **Search**

| HOME | DEPOSIT INSURANCE | CONSUMER PROTECTION | INDUSTRY ANALYSIS | REGULATION & EXAMINATIONS | ASSET SALES | NEWS & EVENTS | ABOUT FDIC |

Bank Find                                                    **Institution Directory Home**

Back to Search Bank Find

Your Bank at a Glance

**Wells Fargo Bank, National Association** (FDIC Cert: 3511) **Is FDIC Insured.**

**Wells Fargo Bank, National Association** has been FDIC insured since **January 1, 1934.**
It was established on **January 1, 1870.**
Its main office (headquarters) is located at:
> **101 N. Phillips Avenue**
> **Sioux Falls, South Dakota 57104**
> **County of Minnehaha**

**Wells Fargo Bank, National Association** has **6834** Domestic Branches (Offices) located in **41** state(s) and **37** Foreign Offices. (Check to locate Branches (Offices) by state.)

Wells Fargo Bank, National Association's reported (or primary) website: http://www.wellsfargo.com:80/

**Wells Fargo Bank, National Association** is chartered as a National Bank. Therefore the primary regulator is the Office of the Comptroller of the Currency (OCC). For **consumer assistance** regarding an issue with this institution, please contact the OCC directly using http://www.helpwithmybank.gov/.

Calculate your FDIC insurance coverage at Wells Fargo Bank, National Association using FDIC EDIE at www.fdic.gov/edie. Last financial information available about Wells Fargo Bank, National Association. Historical profile of Wells Fargo Bank, National Association.

For additional information please click on one of the following:
1. For more information on Federal Deposit Insurance, Your Insured Deposits or Insured or Not Insured
2. View the industry's overall picture - Statistics at a Glance
   (This will open a new window.)